**Pamela J. TIMM, Plaintiff,**

v.

**Russell L. DELONG, Defendant.**

No. 8:98CV43.

United States District Court, D. Nebraska.

June 22, 1998.

John D. Feller, San Houston, Beemer, NE, for plaintiff.

James A. Davis, Davis & Associates, Fremont, NE, for defendant.

## MEMORANDUM and ORDER

SHANAHAN, District Judge.

Before the court are (1) filing no. 7, the "Rule 12 Motion," filed by the defendant, Russell L. DeLong; and (2) filing no. 10, the "Motion to File Reply Brief in Support of Rule 12 Motion," filed by the defendant, Russell L. DeLong. The parties have submitted briefs for consideration.

## STANDARD OF REVIEW

Generally, when considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must construe the complaint liberally and assume all factual allegations to be true. *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1308 (8th Cir. 1997); *Goss v. City of Little Rock*, 90 F.3d 306, 308 (8th Cir.1996); *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir.1996). However, the parties have submitted material outside the pleadings for consideration. Fed.R.Civ.P. 12(c) dictates that "[i]f, on motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in [Fed.R.Civ.P.] 56." *See generally Chantal v. United States*, 104 F.3d 207, 209 (8th Cir. 1997) (concluding that the court properly treated a motion to dismiss as a motion for summary judgment where the movant submitted several exhibits in support of the motion). In accordance with Fed.R.Civ.P. 12(b)(6), the court shall treat filing no. 7, the "Rule 12 Motion," filed by the defendant, Russell L. DeLong, as a motion for summary judgment. *See Madewell v. Downs*, 68 F.3d 1030, 1048 (8th Cir.1995).

Summary judgment, pursuant to Fed.R.Civ.P. 56, is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Morgan v. Rabun*, 128 F.3d 694, 696 (8th Cir.1997); *Roberts v. Francis*, 128 F.3d 647, 650 (8th Cir.1997). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657–58 (8th Cir.1997) (quoting Fed.R.Civ.P. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir.1997) (quoting Fed.R.Civ.P. 56(e)). A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Thomas v. Runyon*, 108 F.3d 957, 959 (8th Cir.1997); *Ruby v. Springfield R–12 Pub. Sch. Dist.*, 76 F.3d 909, 911 (8th Cir.1996); *Bell Lumber and Pole Co. v. U.S. Fire Ins. Co.*, 60 F.3d 437, 445 (8th Cir.1995). Thus, a nonmoving party may not rest on a complaint alone, but must introduce affidavits or other evidence to avoid summary judgment. *Jetton v. McDonnell Douglas Corp.*, 121 F.3d 423, 427 (8th Cir.1997). In determining whether the nonmoving party has sufficiently articulated a genuine issue of material fact, the court acknowledges that its task "is not ... to weigh the evidence and determine the truth of the matter but [merely] to determine whether there is a genuine issue for trial." *Kneibert v. Thomson Newspapers*, 129 F.3d 444, 456 (8th Cir. 1997) (quotations omitted); *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1194 (8th Cir.1995).

## BACKGROUND

The plaintiff, Pamela J. Timm (Timm), seeks to invoke the protections of the Violence Against Women Act (VAWA) in response to the conduct of the defendant, Russell L. DeLong (DeLong). Prior to the initiation of this action, Timm and DeLong were married. On June 6, 1997, Timm and DeLong obtained a divorce decree in the District Court for Saunders County, Nebraska. DeLong subsequently

initiated a defamation suit against Timm in the District Court for Douglas County, Nebraska. DeLong now seeks the dismissal of this action for the following reasons: (1) the doctrine of res judicata bars the action; (2) Timm has failed to state a claim under the Violence Against Women Act in that no "crime of violence" has been committed; (3) Timm is equitably estopped from competently testifying at trial; and (4) the Violence Against Women Act is unconstitutional.

## RES JUDICATA

■ The court initially acknowledges that the law of Nebraska determines whether and how the res judicata doctrine applies. *See generally Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so. . . .") (quoting *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)). Nebraska recognizes that res judicata bars relitigation of any right, fact, or matter directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions. *State on Behalf of Hopkins v. Batt*, 253 Neb. 852, 859, 573 N.W.2d 425, 431–32 (Neb.1998); *DeVaux v. DeVaux*, 245 Neb. 611, 514 N.W.2d 640 (Neb.1994); *see also Antelope County Farmers Coop. v. Citizens State Bank*, 240 Neb. 760, 484 N.W.2d 822 (Neb.1992); *Kerndt v. Ronan*, 236 Neb. 26, 458 N.W.2d 466 (Neb.1990); *State v. Gerdes*, 233 Neb. 528, 446 N.W.2d 224 (Neb.1989); *NC + Hybrids v. Growers Seed Ass'n*, 228 Neb. 306, 422 N.W.2d 542 (1988). The doctrine of res judicata rests both on the public policy decision and necessity to terminate litigation and on the belief that a person should not be vexed

twice for the same cause. *Dakota Title & Escrow Co. v. World–Wide Steel Sys., Inc.*, 238 Neb. 519, 526, 471 N.W.2d 430, 435 (Neb.1991); *Farmers State Bank v. Germer*, 231 Neb. 572, 577, 437 N.W.2d 463, 467 (Neb.1989). Within these confines, the court must, as a threshold matter, consider whether Timm's federal claims based upon VAWA were directly addressed or necessarily included in the parties' state marital dissolution proceeding.

■ The state marital dissolution proceeding was an action to dissolve the marriage, establish alimony and divide ownership of marital assets. In contrast, the federal claim seeks "to protect the civil rights of victims of gender-motivated violence and to promote public safety, health, and activities affecting interstate commerce." 42 U.S.C. § 13981(a). The significance of VAWA is its recognition of a federal civil right, with attendant remedies, which is distinct in remedy and purpose from state marital dissolution proceedings.

In rendering this conclusion, the court acknowledges that a plaintiff who obtains relief in a civil rights lawsuit "does so not for [herself] alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." *City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986) (citations omitted). The distinct societal function Congress sought to confer by enacting the VAWA civil remedy was to provide by a plaintiff's verdict "a special societal judgment that crimes motivated by gender bias are unacceptable because they violate the victims' civil rights." S.REP. No. 103– 138, at 50 (1993). Given the distinct function of VAWA's civil remedy, there is no impermissible duplication of or encroachment upon the judgment rendered in the state marital dissolution proceeding. While violence among family members often serves as a conduit through which discriminatory animus is expressed, the federal claim spe-

cifically focuses on gender animus, and not the general domestic relation.

Further, applying the doctrine of res judicata to preclude a civil rights claim premised upon VAWA in response to a state marital dissolution proceeding contravenes the purpose of VAWA. The effect of invoking the doctrine of res judicata would be to preclude a battered individual from seeking redress under VAWA because the individual had participated in a state marital dissolution proceeding. This court is unwilling to endorse such a result. Moreover, to address any fears that VAWA would collaterally encroach upon judgments rendered in state marital dissolution proceedings, legislators recognized the distinct nature of domestic actions and explicitly precluded the possibility that federal causes of action brought under section 13981 of VAWA would trammel state court proceedings in areas such as divorce, alimony, and child custody. See 42 U.S.C. § 13981(e)(4) (1994) ("Neither section 1367 of title 28 nor subsection (c) of this section shall be construed, by reason of a claim arising under such subsection, to confer on the courts of the United States jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree."). Having determined as a threshold matter that Timm's federal claims based upon VAWA were not directly addressed or necessarily included in the parties' state marital dissolution proceeding, this court concludes that it is unnecessary to consider the remaining four factors recognized by Nebraska law in applying the doctrine of res judicata.

## CRIME OF VIOLENCE

In 1994, Congress passed the civil rights provisions of VAWA. The Violence Against Women Act provides that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). Section 13981 of VAWA, or the civil rights provision, provides a civil cause of action for relief from crimes of violence motivated by gender. 42 U.S.C. § 13981 (1994).

In order to maintain a claim under the Violence Against Women Act, Timm must show that DeLong committed a "crime of violence" against her person or property. VAWA defines a "crime of violence" as an offense which would either (1) "constitute a felony against the person," or (2) "constitute a felony against property if the conduct presents a serious risk of physical injury to another," and would come within the meaning of state or federal offenses described in 18 U.S.C. § 16. 42 U.S.C. § 13981(d)(2)(A). A crime in the latter category is either an offense that has as an element "the use, attempted use, or threatened use of physical force against the person or property of another," or is an offense that is a felony and that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16. VAWA thus requires a demonstration of a predicate felony offense in order to state a claim under the Act. Furthermore, the "act or series of acts" are considered to be "motivated by gender" when they are "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender...." 42 U.S.C. § 13981(d)(1).[1]

In this case, Timm alleges that she was both physically assaulted and sexually assaulted by DeLong. Timm alleges that the physical and sexual assaults in question constitute four separate felony offenses under Nebraska law: assault in the second degree, assault in the first degree, sexual assault in the second degree and sexual assault in the first degree. The

---

1. DeLong only challenges Timm's ability to state a claim under VAWA with regards to the "crime of violence" requirement. Therefore, the "gender animus" requirement of section 13981 will not be addressed in this Order.

controlling four Nebraska statutes are as follows:

(1) Neb.Rev.Stat. § 28–309, Assault in the second degree, provides that a person commits assault in the second degree if he intentionally or knowingly causes bodily injury to another person with a dangerous instrument or recklessly causes serious bodily injury to another person with a dangerous instrument. Assault in the second degree is a Class IV felony.

(2) Neb.Rev.Stat. § 28–308, Assault in the first degree, provides that a person commits assault in the first degree if he intentionally or knowingly causes serious bodily injury to another person. Assault in the first degree is a Class III felony.

(3) Neb.Rev.Stat. § 28–320, Sexual assault in the second degree, provides that a person commits sexual assault in the second degree if he subjects another person to sexual contact (a) without the consent of the victim, or (b) knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct. Sexual assault in the second degree is a Class III felony if the actor caused serious personal injury to the victim.

(4) Neb.Rev.Stat. § 28–319, Sexual assault in the first degree, provides that a person is guilty of sexual assault in the first degree if he subjects another person to sexual penetration (a) without the consent of the victim, or (b) knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct. Sexual assault in the first degree is a Class II felony.

█ Upon review and consideration of the record, the court finds and concludes that DeLong's alleged conduct constitutes a predicate felony offense under one or more of the enumerated Nebraska code provisions. Contrary to the assertions of DeLong, it is not necessary that DeLong's conduct be charged as a felony offense. Section 13981(d)(2)(A) of VAWA states, *inter alia*, that a crime of violence is an "act or series of acts that *would constitute* a felony against the person ... *whether or not those acts have actually resulted in criminal charges, prosecution, or conviction ....*" 42 U.S.C. § 13981(d)(2)(A) (emphasis added). Consistent with this code provision, the decision not to file felony charges or to file misdemeanor charges based on felonious conduct has little import in the court's determination of whether DeLong committed an "act of violence" for the purposes of VAWA. The court must only determine whether the act or series of acts allegedly committed by DeLong *would constitute* a felony under the purview of VAWA. Accordingly, the court finds that, for the purposes of VAWA, DeLong's conduct appears to constitute one or more of the four Nebraska felonies as previously delineated, thereby enabling Timm to state a valid cause of action under VAWA. *See* 42 U.S.C. § 13981(d)(2)(A); *see also McCann v. Rosquist*, 998 F.Supp. 1246, 1248–49 (D.Utah 1998) (discussing the history of the VAWA civil rights cases to date and how the "crime of violence" requirement can be met).

## PLAINTIFF'S COMPETENCY TO TESTIFY

DeLong contends that Timm is equitably estopped from competently testifying. Timm, therefore, advocates the dismissal of the above-entitled action. DeLong supports this contention by alleging that a prior defamation suit, Timm admitted to lacking the mental capacity to remember certain events that occurred during April and May, 1996.

█ It is a well-established principle, embodied in Fed.R.Evid. 601, that witnesses are presumed competent to testify. *United States v. Skorniak*, 59 F.3d 750, 755 (8th Cir.1995). The admissions made by Timm, without more, are insufficient to overcome this presumption. This conclu-

sion is buttressed by the Supreme Court conclusion, more than a century ago, that even a "lunatic or a person affected with insanity is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." *District of Columbia v. Armes*, 107 U.S. 519, 521–22, 2 S.Ct. 840, 841–43, 27 L.Ed. 618 (1883).

Additionally, a determination that Timm is incompetent to testify does not necessarily result in the demise of this action. Other sources of evidence may establish the factual foundation of the underlying claims. For example, Timm indicates her ability to introduce admissions, eyewitness testimony, medical evidence and police reports. Therefore, upon review and consideration, the court finds and concludes that, at present, DeLong's contention regarding plaintiff's competency to testify is without merit.

## CONSTITUTIONALITY OF VAWA[2]

■ The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States...." U.S. CONST. art I, § 8, cl. 3. In assessing whether Congress has exceeded its authority under the Commerce Clause, it is important to note that each act of Congress is entitled to a strong presumption of validity and constitutionality, and will be invalidated only "for the most compelling constitutional reasons." *Mistretta v. United States*, 488 U.S. 361, 384, 109 S.Ct. 647, 661, 102 L.Ed.2d 714 (1989) (quoting *Bowsher v. Synar*, 478 U.S. 714, 736, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583 (1986)). "Given the deference due 'the duly enacted and carefully considered decision of a coequal and representative branch of our Government,' [the court does] not lightly second-guess such legislative judgments, particularly where the

judgments are based in part on empirical determinations." *Board of Educ. of Westside Community Sch. v. Mergens xe rel. Mergens*, 496 U.S. 226, 251, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (citation omitted). This due deference to legislative judgments constitutes the "paradigm of judicial restraint." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993).

In view of the doctrine of judicial restraint, the task of the court in determining the constitutionality of VAWA is "relatively narrow." *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981); *see also United States v. Lopez*, 514 U.S. 549, 568, 115 S.Ct. 1624, 1634, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring) ("The history of the judicial struggle to interpret the Commerce Clause ... counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power."). Accordingly, the court must exercise the necessary restraint and deference in evaluating Congress' authority to enact the civil provisions of VAWA under the Commerce Clause.

■ Congress has the authority to legislate within the confines of the Commerce Clause powers in three contexts:

First, Congress may regulate the use of the channels of interstate commerce ... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities ... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce ..., i.e., those activities that substantially affect interstate commerce.

2. The stated purpose of the civil rights provision of VAWA is "to protect the civil rights of victims of gender motivated violence and to

promote public safety, health and activities affecting interstate commerce...." 42 U.S.C. § 13981(a) (1994).

*Lopez*, 514 U.S. at 558–59, 115 S.Ct. at 1629–30 (citations omitted); *United States v. Wright*, 128 F.3d 1274 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1376, 140 L.Ed.2d 524 (1998) (rejecting a commerce clause challenge to the constitutionality of the criminal provision of VAWA and reiterating *Lopez*'s three-part test).

■ "The first two categories of authority are inapposite:" VAWA "is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can [VAWA] be justified as a regulation [protecting] an instrumentality of interstate commerce or a thing in interstate commerce." *Lopez*, 514 U.S. at 559, 115 S.Ct. at 1630. "Thus, if [VAWA] is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce." *Id.*

Within the framework of this third category, Congress need only have a rational basis for concluding that violence against women substantially affects interstate commerce. *Id.* at 557 n. 2, 115 S.Ct. at 1629 n. 2; *see Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360 (When "a rational basis [exists] for such a finding," the "court must defer" to the congressional finding.).

In determining whether Congress has a rational basis for concluding that violence against women substantially affects interstate commerce, the court must examine relevant congressional findings.[3] Congress made extensive and detailed findings in preparation for the enactment of VAWA.[4] Congress held hearings for four years and made voluminous factual determinations regarding the problem of violence against women and its effect on interstate commerce. *Doe v. Doe*, 929 F.Supp. 608, 611 (D.Conn.1996). For example, Congress found that:

> "Violence is the leading cause of injury to women ages 15–44 . . . ." S.Rep. No. 103–138, at 38 (1993).

> An estimated 4 million American women are battered each year by their husbands or partners. Approximately 95% of all domestic violence victims are women. H.R.Rep. No. 103–395, at 26 (1993) (footnotes omitted).

> Three out of four American women will be victims of violent crimes sometime during their life. *Id.* at 25 (footnote omitted).

> One-third of all women who are murdered die at the hands of a husband or boyfriend. S.Rep. No. 103–138 (1993) (footnote omitted).

> Every week, during 1991, more than 2,000 women were raped and more than

3. Indeed, post-*Lopez*, numerous courts have reiterated that such deference to congressional findings is required; "court[s] must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Terry v. Reno*, 101 F.3d 1412, 1416 (D.C.Cir.1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2431, 138 L.Ed.2d 193; *Project v. United States*, 101 F.3d 11, 12–13 (2d Cir.1996) (same); *United States v. McKinney*, 98 F.3d 974, 979 (7th Cir.1996), *cert. denied,* 520 U.S. 1110, 117 S.Ct. 1119, 137 L.Ed.2d 319 (1997) (same); *United States v. Hampshire*, 95 F.3d 999, 1004 (10th Cir.1996), *cert. denied,* 519 U.S. 1084, 117 S.Ct. 753, 136 L.Ed.2d 690 (1997) (same); *United States v. Kim*, 94 F.3d 1247, 1249–50 (9th Cir.1996) (same); *United States v. Bishop*, 66 F.3d 569, 577 (3d Cir.1995), *cert. denied,* 516 U.S. 1066, 116 S.Ct. 750, 133 L.Ed.2d 698 (1996) (same); *Cheffer v. Reno*,

55 F.3d 1517, 1520–21 (11th Cir.1995) (same); *see also U.S. v. Knutson*, 113 F.3d 27, 29–31 (5th Cir.1997) (upholding 18 U.S.C. § 922(*o*) solely on the basis of "congressional findings" and noting that *Lopez* "made clear that federal Commerce Clause legislation continues to merit a high degree of judicial deference"); *United States v. Monteleone*, 77 F.3d 1086, 1091–92 (8th Cir.1996) (upholding 18 U.S.C. § 922(d) on the basis of "explicit congressional findings").

4. While most of Congress' findings do not appear in the VAWA statute itself, the Supreme Court has also looked to various congressional committee reports in order to make a determination on the constitutionality of a statute under the Commerce Clause. *See Lopez*, 514 U.S. at 562, 115 S.Ct. at 1631.

90 women were murdered—9 out of 10 by men. *Id.*

"[F]or the past 4 years [prior to 1993], the U.S. Surgeons General have warned that family violence—not heart attacks or cancer or strokes—poses the single largest threat of injury to adult women in this country." S.REP. No. 103–138, at 41–42 (1993) (footnote omitted).

The committee reports further detail Congress' findings that the problem of violence against women is pervasive and, as such, substantially impacts interstate commerce. Domestic violence alone is estimated to cost employers "at least $3 billion—not million, but billion—dollars a year" due to absenteeism in the workplace. S.REP. No. 101–545, at 33 (1990). Furthermore, "estimates suggest that society spends $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence." S.REP. No. 103–138, at 41 (1993). Moreover, "[i]t is not a simple matter of adding up the medical costs, or law enforcement costs, but of adding up all of those expenses plus the costs of lost careers, decreased productivity, foregone educational opportunities, and long-term health problems." S.REP. No. 101–545, at 33 (1990).

Congress not only found that violence against women costs this country billions of dollars annually in pure monetary terms, but also, Congress discovered that violence against women has catastrophic social ramifications that impact interstate commerce as well. Abuse of women has "a devastating social and economic impact on the family and the community." *Id.* (footnote omitted). Fear of violence "takes a substantial toll on the lives of all women, in lost work, social, and even leisure opportunities." S.REP. No. 102–197, at 38 (1991). For example, violence against women perpetuates employee absenteeism as many women are unable to leave their homes for fear of continued violence or are afraid to show the physical effects of violence already perpetrated. S.REP. No. 101–545 (1990). Even women who have never been victims of violence fear violence and tailor their lives accordingly, many times foregoing travel, leisure, and work opportunities. *See* H.R.CONF. REP. No. 103–711, 1994 U.S.Code Cong. & Admin.News 1839 (1994). Thus, based upon a thorough investigation of the problem of violence against women and its varied effects on interstate commerce, Congress found that:

> [C]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

H.R.CONF.REP. No. 103–711, at 385 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1839, 1853. The legislative history of VAWA explicitly suggests that Congress has the power to create the VAWA civil rights remedy under the Commerce Clause:

> Gender-based violent crimes meet the modest threshold required by the Commerce Clause. Gender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy. Gender-based violence bars its most likely targets—women—from full participation in the national economy. For example, studies report that almost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime. Even the fear of gender-based violence affects the economy because it deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence....
>
> For example, women often refuse higher paying night jobs in service/retail

industries because of the fear of attack. Those fears are justified: the No. 1 reason why women die on the job is homicide and the highest concentration of those women is in service/retail industries ... 42 percent of deaths on the job of women are homicides; only 12 percent of the deaths of men on the job are homicides.

S.REP. No. 103–138, at 54 & n. 70 (1993) (footnotes omitted).

In light of Congress' findings, supported by both testimony and statistics, it would appear that a rational basis exists for the enactment of VAWA and that Congress has not "exceeded limits allowable in reason for the judgment which it has exercised." *Polish Nat'l Alliance v. NLRB*, 322 U.S. 643, 650, 64 S.Ct. 1196, 1200, 88 L.Ed. 1509 (1944). However, just because Congress says that an activity affects interstate commerce does not make it so. *See Hodel*, 452 U.S. at 311, 101 S.Ct. at 2391–92. "[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional powers of Congress to regulate them is ultimately a judicial rather than a legislative question...." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258 (1964).

Despite extensive congressional findings, DeLong asserts that the *Lopez* decision necessitates the declination of VAWA's constitutionality.[5] However, section 13981 of VAWA does not fall victim to the same infirmities that led the Court to strike down the Gun–Free School Zones Act at issue in *Lopez*. The *Lopez* Court marshaled five factors to conclude that the Commerce Clause could not sustain the Gun–Free School Zones Act. First, the Gun–Free School Zones Act did not regulate an economic activity. *See Lopez*, 514 U.S. at 561, 115 S.Ct. at 1630–31. Second, the effect on interstate commerce was not substantial. *Lopez*, 514 U.S. at 561, 115 S.Ct. at 1632. Third, the Gun–Free School Zones Act contained no congressional findings to support a connection to interstate commerce. *Id.* Fourth, the Gun–Free School Zones Act regulated an area of traditional state concern. *Lopez*, 514 U.S. at 561, 115 S.Ct. at 1631–32. Fifth, Gun–Free School Zones Act contained no jurisdictional element that would provide a link to interstate commerce on a case-by-case basis. Since congressional findings suggest that a substantial effect on interstate commerce exists, the court's discussion will concentrate on the remaining three possible infirmities of VAWA as enacted under the Commerce Clause.

### 1. Regulation of Economic Activity

Unlike the tenuous approach employed by the government in *Lopez*,[6] the present

**5.** DeLong echoes post-*Lopez* calls for stricter judicial scrutiny of congressional power under the Commerce Clause. *See, e.g., United States v. Bishop*, 66 F.3d 569, 603 (3d Cir. 1995) (Becker, J., dissenting) (calling Lopez a "watershed" case that shifted the boundaries of the Commerce Clause and threw into doubt the constitutionality of non-commercial intrastate crimes), *cert. denied*, 516 U.S. 1032, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995); *United States v. Chesney*, 86 F.3d 564, 580 n. 11 (6th Cir.1996) (Batchelder, J., concurring) ("Lopez presages a return to the day when the Congress's interstate commerce authority had meaningful limits."); *United States v. Wilson*, 73 F.3d 675, 691 (7th Cir.1995) (Coffey, J., dissenting) (describing Lopez as a "landmark case"). Academics have also debated the potential changes in post-*Lopez* Commerce Clause jurisprudence. *See, e.g.,* Richard A.

Epstein, *Constitutional Faith and the Commerce Clause*, 71 NOTRE DAME L.REV. 167, 167 (1996) ("*Lopez* may turn out to be a flash in the pan, or it may usher in a new age of constitutional restraint.") (footnote omitted); *cf.* Lino A. Graglia, *United States v. Lopez: Judicial Review Under the Commerce Clause*, 74 TEX.L.REV. 719, 767 (1996) (predicting that "[i]t is most unlikely ... that the Court will be able to muster five votes to invalidate a commerce power measure when Congress does not commit the oversight that explains *Lopez*").

**6.** In addition to the previously stated ways in which the statute in *Lopez* differs from VAWA, the reasoning supporting the connection between violence against women and interstate commerce is much less tenuous than the reasoning used in support of the statute at issue

examination of the constitutionality of section 13981 of VAWA does not depend upon the assertion that violence against women, by decreasing women's travel and spending, will decrease the number of goods crossing state lines, which, in turn, exerts a negative impact on interstate commerce. Rather, the constitutionality· of section 13981 relies on the premise that violence against women seriously impairs national economic productivity and, therefore, is surely a concern within Congress' realm of legislative authority.

Further, *Lopez* did not curtail Congress' power to regulate activities which interfere with interstate commerce. *See Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626. The *Lopez* Court criticized the Gun–Free School Zones Act because the Act did not regulate a commercial or economic activity: "[the Act] is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561, 115 S.Ct. at 1630–31. Despite the Court's failure to recognize an economic foundation for the Act, it stopped short of mandating an economic basis as a prerequisite for all legislation deriving from the Commerce Clause. As the

Eighth Circuit noted in *United States v. Dinwiddie*, "[t]here is no authority for the proposition that Congress' power extends only to the regulation of commercial entities." *United States v. Dinwiddie*, 76 F.3d 913, 921 (8th Cir.1996) (citations omitted); *See, e.g., National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 255–61, 114 S.Ct. 798, 803–06, 127 L.Ed.2d 99 (1994) (racketeering activity by a non-commercial enterprise can have a sufficient effect on interstate commerce so as to be punishable under RICO, a statute enacted under Congress' Commerce Clause power). In making this conclusion, the court acknowledges that confining congressional regulation to commercial entities would have jeopardized several previous Supreme Court rulings including *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); and *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Given this opportunity, however, the *Lopez* Court chose to affirm, rather than overturn, these cases.[7]

In *Wickard*, the Court ruled that regulation of a non-commercial, intrastate activi-

---

in *Lopez*. Because Congress made no findings in support of § 922(q), the statute at issue in *Lopez*, the Government was forced to argue that guns in schools affected commerce based upon several tenuous, multi-layered theories. *See Lopez*, 514 U.S. at 564, 115 S.Ct. at 1632; *Terry v. Reno*, 101 F.3d 1412, 1418 (D.C.Cir.1996) (quoting *Lopez*, 514 U.S. at 564, 115 S.Ct. at 1632) (For example, "gun possession near schools threatens the educational environment, which hampers the educational process, which creates a 'less productive citizenry' which adversely affects 'the Nation's economic wellbeing' and which in the end adversely affects interstate commerce."). By contrast, VAWA regulates behavior—gender-based violent crime against women—which Congress, based upon thorough and persuasive findings, has found substantially and gravely affects interstate commerce.

7. *Lopez* did not overrule a single Commerce Clause precedent, signal a decrease in congressional power under the Commerce

Clause, or abandon the "rational basis" test. *Lopez*, 514 U.S. at 557–69, 115 S.Ct. at 1629–34; *see also United States v. Wright*, 117 F.3d 1265, 1269 (11th Cir.1997) ("*Lopez* did not alter our approach to determining whether a particular statute falls within the scope of Congress's Commerce Clause authority."); *United States v. Wilson*, 73 F.3d 675, 685 (7th Cir.1995) (The *Lopez* Court "reaffirmed rather than overturned the previous half century of Commerce Clause precedent"), *cert. denied*, 519 U.S. 806, 117 S.Ct. 46, 46–47, 136 L.Ed.2d 12 (1996). In fact, in describing the history of the Court's Commerce Clause jurisprudence, *Lopez* forthrightly affirmed the modern expansive view of Congress' power under the Commerce Clause, and eschewed the more restrictive view of "commerce" based on formalistic distinctions between "direct" and "indirect" effects on interstate commerce. *Lopez*, 514 U.S. at 555–57, 115 S.Ct. at 1627–29; *see also Lopez*, 514 U.S. at 574, 115 S.Ct. at 1637 (Kennedy, J., concurring) (Lopez does not "call in question" prior commerce clause "principles").

ty was permissible when the aggregation of that activity affected interstate commerce. *Wickard,* 317 U.S. at 125, 63 S.Ct. at 89; *see also Heart of Atlanta Motel,* 379 U.S. at 258, 85 S.Ct. at 358; *U.S. v. Dinwiddie,* 76 F.3d at 920. The aggregation of discriminatory violence against women affects interstate commerce by decreasing businesses' productivity, curtailing women's willingness to travel and participate in leisure activities, and generally diminishing women's ability to operate as full market participants. This decreased productivity translates into the loss of billions of dollars, S.REP. No. 101–545, at 33 (1990), which bears a substantial impact on the nation's economy. Acts of violence themselves may not be of an economic nature individually, yet in the aggregate, may create a heavy burden on intrastate as well as interstate commerce. *See generally Dinwiddie,* 76 F.3d at 921.

Similarly, burdens on interstate commerce due to racial discrimination necessitating congressional intervention were found in *Heart of Atlanta Motel* and *Katzenbach v. McClung.* While *Heart of Atlanta Motel* and *Katzenbach v. McClung* arguably addressed the commercial enterprises of lodging and eating establishments, these cases certainly involved regulation of an intrastate nature. Intrastate

regulation was required, according to the Court, because the burden of racial discrimination on business and interstate travel warranted a federal solution. *Katzenbach v. McClung,* 379 U.S. at 300, 85 S.Ct. at 381. Thus, VAWA's civil rights provision presents a federal redress for nation-wide discrimination against women. The congressional findings of fact, previously discussed, demonstrate the burden that gender-based violence inflicts on the economic activity of citizens and businesses.[8]

## 2. The Regulation of an Area of Traditional State Concern

VAWA is also distinguishable from *Lopez* in that VAWA does not invade areas of traditional state control.[9] The *Lopez* Court noted that "[u]nder our federal system, the 'States possess primary authority for defining and enforcing the criminal law.' ... When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.' " *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1631 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 635, 113 S.Ct. 1710, 1720–21, 123 L.Ed.2d 353 (1993), and *United States v. Enmons,* 410 U.S. 396,

8. The absence of a clear dictate regarding the underlying economic nature of the regulated activity, coupled with the remainder of the *Lopez* opinion, suggests that the Court did not intend constitutionality to hinge solely on an inquiry into the underlying economic nature of the regulated activity. The Court could have simply "observed that the regulated activity was not economic and ended the inquiry there." Kerrie E. Maloney, Note, *Gender–Motivated Violence and the Commerce Clause: The Civil Rights Provision of the Violence Against Women Act After Lopez,* 96 Co-LUM.L.REV. 1876, 1914 (1996). Therefore, a failure to find economic grounds for the civil rights provision of VAWA, by this court, would not serve as an absolute beacon of VAWA's unconstitutionality.

9. Additionally, unlike the statute invalidated in *Lopez,* VAWA does not occupy a legal realm

where "[s]tates lay claim by right of history and expertise." *Lopez* 514 U.S. at 583, 115 S.Ct. at 1641 (Kennedy, J., concurring). The Violence Against Women Act is an attempt to secure civil rights for women, a subsection of society that has traditionally been ignored in other civil rights legislation. *See* S.REP. No. 103–138 (1993) (detailing the curious absence of civil rights for women among the various other groups against whom there has been pervasive discrimination and corrective legislation); S.REP. No. 102–197 (1991) (same); S.REP. No. 101–545 (1990) (same). Furthermore, federal action is particularly appropriate when, as is the case with violence against women, there is compelling evidence that the states have not successfully protected the rights of a class of citizens. In enacting VAWA, Congress made extensive findings relating to the various state inadequacies in ameliorating the problem of violence against women, protecting the victims, and punishing

411–12, 93 S.Ct. 1007, 1015–16, 35 L.Ed.2d 379 (1973)). Unlike the statutory provision in *Lopez*, the civil rights provision of VAWA is not a criminal statute and does not inhibit state criminal proceedings against those who commit violence against women. Nothing in section 13981 of VAWA prevents or discourages a victim of gender-based violence from bringing state criminal charges or pursuing state tort remedies, or affects how the state treats those claims when and if they are initiated.[10] *See Palazzolo v. Ruggiano*, 993 F.Supp. 45, 47 (D.R.I.1998) ("The cause of action created by VAWA supplements and does not supplant any claims that a plaintiff may have under applicable state law.").

In fact, far from impinging upon state law, Congress carefully drafted VAWA to be harmonious with state law and protect areas of traditional state concern. *See Brzonkala v. Virginia Polytechnic Inst. and State Univ.*, 132 F.3d 949, 971 (4th Cir.1997), *vacated en banc* (4th Cir.1998) ("In sum, VAWA acts to supplement, rather than supplant, state criminal, civil, and family law controlling gender violence."); *Doe v. Doe*, 929 F.Supp. 608, 615–16 (D.Conn.1996) ("VAWA does not encroach on traditional areas of state law; it complements them by recognizing a societal interest in ensuring that persons have a civil right to be free from gender-based violence...."). First, courts must define the term "crime of violence" by referencing both state and federal definitions of felonies. *See* 42 U.S.C. § 13981(d)(2). Secondly, Congress further limited VAWA by stating that VAWA actions did not encompass divorce, alimony, or child custody cases. Domestic relations issues have always been within the province of a state, and VAWA does not impermissibly alter this fact. *See* 42 U.S.C. § 13981(e)(4) (VAWA does not confer "jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree."). Finally, the language in section 13981(e)(1) suggests that VAWA only encompasses crimes clearly "motivated by gender" and not "random acts of violence unrelated to gender." 42 U.S.C. § 13981(e)(1). This language indicates a congressional intendment that states were exclusively to adjudicate many of the violent crimes committed against women; the federal government would only become involved if the crime were clearly motivated by gender animus, implicating an infringement upon women's civil rights. Instead of encroaching upon areas of traditional state control, VAWA supplements state laws in the area of violence against women so that victims of this type of violence are afforded the most effective remedy possible. State criminal, tort, and family law are left intact in the wake of VAWA. The states remain free to "experiment[ ] to devise various solutions" to the problems of gender-motivated violence. *See Lopez*, 514 U.S. at 581, 115 S.Ct. at 1641 (Kennedy, J., concurring). States also remain free to address violence against women by employing community specific solutions. VAWA simply guarantees women a federal cause of action to redress civil rights violations undergirded by gender-motivated violence. Thus, VAWA only impinges upon states by prohibiting states from denying women redress of civil rights injuries.

### 3. Jurisdictional Element Providing a Link to Interstate Commerce

*Lopez* does not establish as a "prerequisite of constitutionality" that all legislation contain a jurisdictional element. *See United States v. Olin Corp.*, 107 F.3d 1506, 1510 (11th Cir.1997); *United States v. Rybar*, 103 F.3d 273, 285 (3rd Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997); *United States v. Wall*, 92 F.3d 1444, 1449 n. 11 (6th Cir.1996);

the perpetrators. *See* discussion *infra* pp. 957–61.

**10.** In contrast to state criminal law, the civil rights provision of VAWA makes the perpetrators of violence against women personally accountable to their victims. It is possible that many victims of gender-motivated violence find their attacker's personal accountability to be a welcome addition to existing state laws.

*United States v. Wilson,* 73 F.3d 675, 685 (7th Cir.1995). Rather, *Lopez* denounced the Gun–Free School Zones Act because the Act did not regulate a commercial activity and was not part of a larger scheme regulating economic activity. *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1630–31. Because the connection to interstate commerce was not clear either from the face of the statute or from legislative findings, the Court determined that a jurisdictional element would help ensure that each individual gun possession falling within the prohibitions of the Act implicated interstate commerce. *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1631.

The essential teaching of *Lopez* is simply that Congress must ensure that legislation enacted pursuant to its Commerce Clause authority reaches only activities that "substantially affect interstate commerce." The jurisdictional nexus is best interpreted as an alternative avenue to constitutionality rather than as a requirement. A jurisdictional element or the existence of congressional findings assists a court in determining whether a regulated activity substantially affects interstate commerce. However, neither is necessary for constitutional validity. *See United States v. Wright,* 117 F.3d 1265, 1269 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 584, 139 L.Ed.2d 422 (1997), *opinion vacated in part on rehearing,* 133 F.3d 1412 (1998) (Congress need not "place a jurisdictional element" in a statute or make "legislative findings connecting the regulated activity to interstate commerce."); *Wilson,* 73 F.3d at 685 ("In discussing the lack of a jurisdictional element in *Lopez,* the Court simply did not state or imply that all ... statutes must have such an element, or that all statutes with such an element would be constitutional, or that

any statute without such an element is per se unconstitutional."); *Terry v. Reno,* 101 F.3d 1412, 1418 (D.C.Cir.1996) ("If a jurisdictional element were critical to a statute's constitutionality, the Court in *Lopez* would not have gone on to examine the Government's proffered rationales for the constitutionality of the gun possession statute.").

That the civil rights provision of VAWA contains no such jurisdictional element, therefore, does not constitute a shortcoming. Furthermore, the civil rights provision does not lend itself to a jurisdictional element. A jurisdictional element would impede the efficacy of the civil rights remedy. In order to invoke the civil rights remedy, a victim would have to establish either (1) that the perpetrator or the victim recently moved in interstate commerce; or (2) that the particular victim was so affected by the violence that the victim was forced to leave the workplace, thereby affecting commerce. No longer would VAWA generally protect the right of individuals to be free from gender-motivated violence; instead, the provision would ensure the right to be free from such violence only if the victim or perpetrator recently moved across state lines [11] or the violence was of such a magnitude so as to affect the particular victim's workplace. Provided that other factors weigh sufficiently in favor of the provision's constitutionality, these arguments suggest that section 13981 need not and, indeed, should not include a jurisdictional element.

In concluding that the civil rights provision of VAWA is constitutional as enacted under the Commerce Clause, this court notes that a majority of courts that have addressed this issue have also determined that Congress had a rational basis for believing that violence against women sub-

---

11. When VAWA has been analyzed in terms of crossing state lines as a means of demonstrating the existence of commerce, it has always been when analyzing the criminal portion of VAWA, not the civil rights provision. *See, e.g., United States v. Wright,* 128 F.3d 1274, 1275–76 (8th Cir.1997). These two provi-

sions of VAWA (the criminal and civil), while part of the same statute, derive their commerce clause authority from different sources. *Compare, e.g., Wright,* 128 F.3d 1274, *with Brzonkala v. Virginia Polytechnic Inst. and State Univ.,* 132 F.3d 949 (4th Cir.1997), *vacated en banc* (4th Cir.1998).

stantially affected interstate commerce. *See, e.g., Brzonkala,* 132 F.3d 949 (4th Cir.1997), *vacated en banc* (4th Cir.1998); *Mattison v. Click Corp. of America, Inc.,* No. Civ.A. 97–CV–2736, 1998 WL 32597 (E.D.Pa. Jan.27, 1998); *Crisonino v. New York City Housing Auth.,* 985 F.Supp. 385 (S.D.N.Y.1997); *Anisimov v. Lake,* 982 F.Supp. 531 (N.D.Ill.1997); *Seaton v. Seaton,* 971 F.Supp. 1188 (E.D.Tenn.1997); *Doe v. Doe,* 929 F.Supp. 608 (D.Conn. 1996); *Doe v. Hartz,* 970 F.Supp. 1375 (N.D.Iowa 1997).

In the alternative, the Enforcement Clause of the Fourteenth Amendment provides a constitutional foundation for VAWA. The Fourteenth Amendment states in part, that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Enforcement Clause of the Fourteenth Amendment provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of [the Fourteenth Amendment]." U.S. CONST. amend. XIV, § 5.

Thus, the Enforcement Clause of the Fourteenth Amendment is a mechanism by which Congress may enact legislation to enforce other aspects of the Fourteenth Amendment. *See generally City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (discussing the history of the Enforcement Clause as a mechanism to prevent and redress injuries). Courts have broadly construed the Enforcement Clause of the Fourteenth Amendment as giving Congress the power to legislate remedies for state deprivations

of equal protection, even if the activities regulated constitute private conduct, and, therefore, would not independently qualify as state action [12] under section 1 of the Fourteenth Amendment.[13] *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) ("Congress ... has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment"); *District of Columbia v. Carter,* 409 U.S. 418, 423–24 & 424 n. 8, 93 S.Ct. 602, 606 & n. 8, 34 L.Ed.2d 613 (1973) (to say that "[t]he Fourteenth Amendment itself 'erects no shield against merely private conduct' ... is not to say ... that Congress may not proscribe purely private conduct under § 5 of the Fourteenth Amendment."); *United States v. Bledsoe,* 728 F.2d 1094, 1097 (8th Cir.1984) (holding that § 5 grants Congress the power to reach purely private action); *Action v. Gannon,* 450 F.2d 1227, 1235 (8th Cir. 1971) (holding that § 5 grants Congress the power to reach purely private action).

The Supreme Court in *Katzenbach v. Morgan* interpreted the Enforcement Clause of the Fourteenth Amendment as "a positive grant of legislative power authorizing congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966). Accordingly, when Congress determines that state inaction necessitates federal regulation of private conduct, Congress does not necessarily exceed the constitutional grant of section 5.[14]

---

**12.** *See* Erwin Chemerinsky, *Rethinking State Action,* 80 Nw.U.L.REV. 503 (1985).

**13.** When private individuals violate the Fourteenth Amendment and the states fail to act, the state's acquiescence constitutes state action in a manner consistent with the requirements of the Enforcement Clause. *See* Barbara Rook Snyder, *Private Motivation, State Action and the Allocation of Responsibility for Fourteenth Amendment Violations,* 75 CORNELL L.REV. 1053, 1081 (1990) (recognizing that

state inaction may constitute state action for purposes of the Fourteenth Amendment).

**14.** *See* Laurence H. Tribe, *The Constitutionality of the Freedom of Access to Clinic Entrances Act of 1993,* 1 VA.J.SOC. POL'Y & L. 291, 295–98 (1994) (stating that when states are "in danger of being overwhelmed in their efforts to prevent" private individuals from committing violence against women, "Congress should supplement [the states'] efforts with its own legislation under the Fourteenth Amend-

Although a dearth of Supreme Court authority explicitly addresses whether state inaction constitutes state action for purposes of the Fourteenth Amendment, several Supreme Court cases involve this issue in parallel contexts. *See Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (holding that race based peremptory strikes for jurors violate the equal protection rights of the challenged jurors and that the court, by allowing this to occur, had "involved itself with invidious discrimination."); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding that when a state fails to require a private lessee of public property to offer its services on a nondiscriminatory basis, the state violates the Fourteenth Amendment); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (opining that judicial action validating private discrimination constitutes state action under the Fourteenth Amendment); *The Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883) (implying that when a state refuses to enforce its laws against discriminatory private conduct, the state has violated the Fourteenth Amendment). Although this line of cases suggests that state inaction may constitute state action for purposes of the Fourteenth Amendment, the Fourteenth Amendment conveys congressional authority over private conduct only where state action/inaction bears some relation to the private conduct.

> The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the state, or not done under state authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the state for redress.

*The Civil Rights Cases,* 109 U.S. at 17, 3 S.Ct. at 25–26.

Therefore, the relevant inquiry becomes whether the problem of violence against women bears some relation to state inaction. The legislative history surrounding VAWA evidences a congressional perception that states are failing to protect the equal rights of women from the immense and invidious problem of gender-based violence. Congress carefully documented the problem of state inaction and made extensive findings regarding the states' inadequacies in addressing the problem of violence against women. For example, Congress found that:

> [a]lmost one quarter of the [state judges] believed that rape victims "sometimes" or "frequently" precipitate their sexual assaults because of what they wear and/or actions preceding the incidents. S.Rep. No. 102–197 (1991) (citation omitted).

> In the past 10 years, almost every State has rushed to pass laws that increase criminal penalties or provide civil remedies for the victims of hate crimes. Few if any of those State laws originally covered gender bias, and less than a dozen now do. *Id.*

> Study after study commissioned by the highest courts of the States—from Florida to New York, California to New Jersey, Nevada to Minnesota—has concluded that crimes disproportionately affecting women are often treated less seriously than comparable crimes against men. "[C]ollectively these reports provide overwhelming evidence that gender bias permeates the court

---

ment."). While Tribe's analysis was directed toward the constitutionality of the Freedom of Access to Clinic Entrances Act, the same Fourteenth Amendment analysis can be applied to VAWA. Tribe also asserts that ("Congress has the authority under Section 5 of the

Fourteenth Amendment to reach purely private conduct once Congress concludes that states and municipalities, acting alone, will be unable to provide sufficient protection against private acts that threaten the full enjoyment of federal constitutional rights . . . .").

system and that women are most often its victims." *Id.* (citation omitted).

Few [victims of rape] even report the crime. Of those survivors who actively seek judicial remedies, only a small percentage are vindicated. Estimates show that a rape survivor may have as little as a 5–percent chance of having her rapist convicted. These facts belie claims that State laws provide "adequate" remedies for the victims of these crimes. *Id.* (footnote omitted).

[V]ictim-blaming attitudes are all too pervasive in this country; they are shared by women and men alike. Witnesses testified that stereotypes like "she asked for it," "she made it up," or "no harm was done" are frighteningly common. Despite States' most fervent efforts at legislative reform, these stereotypes persist and continue to distort the criminal justice system's response to violence against women. They encourage victims' unwilling silence and they blunt society's outrage. *Id.* (citations omitted).

At least in part, State remedies fail because legal rules and practices continue to shine a spotlight of suspicion on the victim. Any person would think twice before reporting and prosecuting a crime if the police responded by demanding a polygraph exam, the prosecutor suggested that the victim had not complained promptly enough, the defense counsel charged that the victim was emotionally unbalanced, and the judge announced to the jury at the end of the trial that the victim's testimony under oath should be viewed with suspicion. These problems are largely unique to sexual assault victims. S.REP. No. 103–138 (1993).

These findings suggest that the states' inability or unwillingness to afford women equal protection constitutes a sanction by the state of the "wrongful acts" of private individuals. *See* S.REP. No. 101–545 (1990); S.REP. No. 102–197 (1991); *see also* Johan-na R. Shargel, *In Defense of the Civil Rights Remedy of the Violence Against Women Act*, 106 YALE L.J. 1849, 1880–81 (1997). In light of these findings, it cannot be said that Congress has exceeded its authority under the Enforcement Clause of the Fourteenth Amendment by enacting VAWA. *See City of Boerne v. Flores*, 117 S.Ct. at 2164 ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.").

Despite this conclusion, the only court to analyze the constitutionality of VAWA under the Fourteenth Amendment found VAWA to be unconstitutional. *See Brzonkala v. Virginia Polytechnic and State Univ.*, 935 F.Supp. 779 (W.D.Va.1996), *rev'd*, 132 F.3d 949 (4th Cir.1997), *vacated en banc* (4th Cir.1998). The district court in *Brzonkala* determined that VAWA was unconstitutional under the Fourteenth Amendment because it policed private action by private individuals, thereby violating the state action requirement of the Fourteenth Amendment. *Id.* at 794, 797. This court respectfully declines to extend the rationale of *Brzonkala.* While it may be true that VAWA regulates conduct by private individuals, it is clear that within the prescribed framework, Congress can reach private conduct under section 5 of the Fourteenth Amendment.

Although VAWA does not regulate the states' actions per se, it is an ancillary remedy ensuring equal treatment of individuals by the government. *See* S.REP. No. 103–138, at 55 (1993) (VAWA's civil rights remedy secures guarantees of Fourteenth Amendment by attacking gender-motivated violence that threaten women's equal protection of laws. VAWA provides the necessary remedy to fill gaps and rectify biases of state laws). Congress enacted VAWA to both redress and prevent injuries to women and to ensure their equal protection under the law, guaranteed to them in section 1 of the Fourteenth

Amendment.[15] Thus, VAWA is a legitimate remedy because it provides women with a means to redress gender-based violence in the face of state inaction. *See Violence Against Women; Victims of the System: Hearing on S.15 Before the Senate Comm. on the Judiciary*, 102nd Cong. 84, 104, 117–18 (1991) (quoting Professor Cass R. Sunstein, University of Chicago School of Law) (observing that VAWA's goal is consistent with the core purpose of the Fourteenth Amendment: to ensure that state criminal justice systems do not discriminate in protecting citizens). In enacting VAWA, Congress endeavored to assure equal protection of the laws to women. *See* S.Rep. No. 103–138, at 55 (1993). By providing women with an alternative forum in which to seek justice for these unlawful actions, Congress acted to address a legitimate equal protection concern. *See id.* (stating that women as a class do not receive equal protection from irrational, hate-motivated abuse and assault). Thus, VAWA ensures women a federal remedy if they are subjected to gender-motivated violence, violence which infringes upon their right to equal protection secured by the Fourteenth Amendment. *See* 42 U.S.C. § 13981(b) (1994).

## SUPPLEMENTAL JURISDICTION

28 U.S.C. § 1367 governs the court's ability to exercise supplemental jurisdiction over state law claims. Section 1367(a) provides as follows:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a) (Supp. II 1990).

Section 1367 provides some exceptions to this general rule. Subsection 1367(b) prohibits district courts from exercising supplemental jurisdiction in certain instances when the basis for original jurisdiction is premised on section 1332 (diversity of citizenship). This subsection does not apply, though, as the jurisdictional foundation of Timm's claim is not diversity of citizenship; but rather a federal question based upon Timm's 42 U.S.C. § 13981 (VAWA) claim. In this particular situation, subsection 1367(c) grants this court discretion to reject supplemental jurisdiction if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (Supp. II 1990).

 Having applied these exceptions to the present case, this court finds and concludes that invocation of the stated exceptions is not warranted and that exercising supplemental jurisdiction is appropriate. The state causes of action that Timm seeks to present are not novel and involve well-established principles of tort law. Additionally, the state law claims do not predominate over the federal issue relative to this court's jurisdiction. The federal

---

15. In defending the Fourteenth Amendment as a valid source of congressional power for enacting VAWA, Congress stated that

> [t]he Constitution authorizes Congress to pass appropriate legislation to enforce the [Fourteenth Amendment's] guarantee of equal rights. [The civil rights provision of VAWA] is "appropriate" legislation for two reasons: first, it attacks gender-motivated crimes that threaten women's equal rights; second, it provides a "necessary" remedy to fill the gaps and rectify the biases of existing State laws.

S.Rep. No. 102–197 (1991) (citations omitted).

cause of action that gave this court original jurisdiction maintains its vitality. Finally, this court can discern no exceptional circumstance that would justify the decision to decline supplemental jurisdiction; in fact, the factual elements of the two causes of action are so closely interrelated that judicial economy is greatly served by this court's exercise of supplemental jurisdiction. Therefore, in the absence of the circumstances explicitly enumerated in subsections (b) and (c), section 1367(a) requires the court to exercise its discretion to extend supplemental jurisdiction over Timm's state law claim.

THEREFORE, IT IS ORDERED:

(1) That filing no. 7, the "Rule 12 Motion," filed by the defendant, Russell L. DeLong, is denied;

(2) That filing no. 10, the "Motion to File Reply Brief in Support of Rule 12 Motion," filed by the defendant, Russell L. DeLong, is granted and the court has considered the reply brief in rendering its decision; and

(3) That pursuant to Fed.R.Civ.P. 54(b), this judgment is not a final and appealable order until after entry of judgment adjudicating all the claims and the rights of the parties.