Debra CULBERSON, et al., Plaintiffs,

v.

Vincent DOAN, et al., Defendants.

No. C–1–97–965.

United States District Court,
S.D. Ohio,
Western Division.

April 8, 1999.

702

Alphonse Adam Gerhardstein, Jennifer Branch, Laufman & Gerhardstein, Cincinnati, OH, for Debra Culberson, Christina Marie Culberson, Roger Culberson, plaintiffs.

Randolph W. Alden, Alden McVay & Durkin, Columbus, OH, for Vincent Doan, defendant.

Paris Kent Ellis, Wall & Ellis, Middletown, OH, for Lawrence Baker, defendant.

Jeffrey W. Bowling, Brandabur & Bowling Co LPA, Hamilton, OH, for Tracey Baker, defendant.

Neil Frank Freund, Freund Freeze & Arnold, Dayton, OH, Jerry Doyle Bryant, Bryant & Mattingly, Wilmington, OH, for Richard Payton, defendant.

Lawrence Edward Barbiere, Robert Stanford Hiller, Schroeder Maundrell Barbiere & Powers, Cincinnati, OH, for Village of Blanchester OH, defendant.

Elizabeth A. Billowitz, Foley Hoagn & Elliott, Boston, MA, Julie Goldscheid, Martha Davis, New York City, for Violence against Women Act, amicus.

Gerald Francis Kaminski, U.S. Attorney, Cincinnati, OH, Marcia K. Sowles, U.S. Department of Justice, Washington, DC, for USA, intervenor.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant Vincent Doan's Motion To Dismiss Plaintiffs' Complaint (doc. 12), the Amici Curiae Brief of the NOW Legal Defense and Education Fund and its Supplemental Authority (docs. 23 and 31), and Plaintiffs' Response to Defendant Vincent Doan's Motion to Dismiss (doc. 24).[1]

## BACKGROUND

The Estate of Clarissa Culberson and Clarissa Culberson's parents, Debra and Roger Culberson, and her sister, Christina Culberson (collectively referred to as "Plaintiffs") bring this action against Vincent Doan ("Defendant"), Lawrence Baker,

---

1. We note that, in their Response, Plaintiffs include a Cross–Motion For Partial Summary Judgment Against Defendant Doan On The Violence Against Women Act Claim (doc. 24), to which Defendant Doan filed a Response and also moved to strike (docs. 28 & 29). Plaintiffs' Motion for Partial Summary Judgment will be addressed in a separate order.

Tracey Baker, Richard Payton, and the Village of Blanchester ("Blanchester") (collectively referred to as "Defendants").

The facts as alleged by Plaintiffs in their Complaint concerning the disappearance and subsequently-ruled death of Clarissa Culberson ("Carrie") are sketchy, yet they tell a grim tale of domestic abuse.

Carrie lived with her mother and sister in Blanchester, Ohio. During 1995, Carrie and Defendant dated on a regular basis. Plaintiffs allege that, in the Fall of 1995, Defendant began to physically abuse Carrie. Plaintiffs contend that on one occasion Defendant "tightly clamped his hand over the nose, mouth and throat of [Carrie], who injured her face trying to pry his fingers off her mouth" (*See* Complaint ¶ 13). Plaintiffs maintain that the abuse continued in 1996, pointing to an incident in which Defendant smashed the windows of Carrie's car as she sat in the vehicle (*Id.* ¶ 14). Although Carrie allegedly reported the incident to the Blanchester police, Plaintiffs assert that no charges were filed against Defendant (*Id.*).

Plaintiffs also allege that Defendant subsequently attacked Carrie in April, July, and August of 1996. As a result of the April attack, Plaintiffs contend that Defendant injured Carrie's head and kidneys (*Id.* ¶ 15). Thereafter, Carrie allegedly filed a police report with the Blanchester police; however, the police did not bring any charges against Defendant (*Id.*). On July 5, 1996, Plaintiffs allege that Defendant forced his way into Carrie's home and threatened her to prevent her from having any contact with other men (*Id.* ¶ 16). During this incident, Defendant allegedly pushed Plaintiff Debra Culberson in an unsuccessful attempt to assault Carrie. (*Id.*). Debra Culberson also filed a criminal report with the Blanchester police department regarding the incident, but asserts that the police did not respond to the report (*Id.*). On July 28, 1996, Plaintiffs allege that Defendant attacked Carrie again when she came to his house while on an errand (*Id.*). Plaintiffs assert that, during this assault, he threw Carrie across a

room and struck her in the head with a metal object, causing her to need surgical staples in her scalp. Carrie again sought criminal charges after this attack through the Blanchester police department (*Id.*). However, according to Plaintiffs, her attempt to get help was again unsuccessful. On August 26, 1996, approximately three days before Defendant allegedly murdered Carrie, Plaintiffs assert that he held her at gunpoint in a barn within the Blanchester area (*Id.* ¶ 18).

On August 29, 1996, at approximately 12:20 a.m., Defendant's neighbor witnessed him hitting Carrie in the head (*Id.* ¶ 19). At approximately 1:30 a.m., Defendant spoke with Lawrence Baker on the telephone (*Id.*). At 3:15 a.m., Defendant arrived at Tracey Baker's residence with blood on his chest, arms and pants (*Id.*). He then took a shower and left the residence with Tracey Baker, who was carrying a handgun and garbage bags. (*Id.*).

At approximately 11:00 a.m., Debra Culberson reported her daughter missing to Blanchester Police Chief Richard Payton ("Chief Payton") (*Id.* ¶ 21). Debra Culberson also reminded Chief Payton at that time of the threats Defendant made to Carrie and the criminal reports made by Carrie during the preceding weeks. Plaintiffs contend that Chief Payton responded, "Why does she keep going back to it?" (*Id.*). Plaintiffs assert that Chief Payton did not investigate Defendant, but went to Lawrence Baker's home later that day and warned him that Carrie had been reported missing and that Defendant would be a suspect (*Id.* ¶¶ 23–24).

On September 3, 1996, the Blanchester police department performed a search of Lawrence Baker's junk yard on September 3, 1996 (*Id.* ¶ 26). During the search, a blood hound and a cadaver dog brought a small pond to the attention of the search party indicating that the dogs may have detected Carrie's scent (*Id.*). The search team officers informed Chief Payton that they wanted the pond drained; however, Chief Payton declined to proceed with the

search that day and advised everyone to leave the premises (*Id.*). Lawrence Baker was present during the search. When the pond was drained the next day, footprints were visible on the bottom of the pond and a muddy path of weeds lead away from the pond (*Id.* ¶ 27).

Carrie's disappearance was ruled a homicide even though her body was never found (*Id.* ¶ 28). Subsequently, Defendant was charged with Carrie's murder. Tracey Baker was charged with obstruction of justice, tampering with evidence, and gross abuse of a corpse. Lawrence Baker was also charged in Carrie's disappearance.

On August 7, 1997, a jury found Defendant guilty of aggravated murder with one capital offense specification, and three counts of kidnaping in the Clinton County Common Pleas Court.[2] He was sentenced to life imprisonment without parole. Tracey Baker's trial began in the Clinton County Court of Common Pleas on May 20, 1998 (*see* doc. 30, Ex. E at 4). On June 4, 1998, a jury found Tracey Baker guilty of two counts of obstruction of justice and one count of tampering with evidence (*Id.*). Tracey Baker was found not guilty of gross abuse of a corpse (*Id.* at 7). The trial of Lawrence Baker began in the Clinton County Court of Common Pleas on August 18, 1998 (*Id.*) On August 25, 1998, the jury returned three not guilty verdicts against Lawrence Baker (*Id.*).

On October 24, 1997, Plaintiffs' filed a complaint against Defendants Vincent Doan, Lawrence Baker, Tracey Baker, Richard Payton, and the Village of Blanchester, seeking both monetary and injunctive relief. In their Complaint, Plaintiffs claim that Defendant's actions toward Carrie were based primarily on account of her gender in violation of the Violence Against Women Act, 42 U.S.C. § 13981 (the "VAWA"). Furthermore, Plaintiffs assert that the actions of Defendants Vincent Doan, Lawrence Baker, Tracey Baker, and Police Chief Richard Payton "were willful, wanton, malicious or in reckless disregard or indifference to the safety of

Carrie Culberson and to the peace of mind, rights, including rights of familial association of Debra Culberson, Roger Culberson, and Christina Culberson" (*Id.* ¶ 34). Plaintiffs also claim that the Defendants violated their rights under 42 U.S.C. § 1983, as protected by the Fourteenth Amendment of the Constitution. Additionally, Plaintiffs assert state law claims of emotional distress, wrongful death, obstruction of justice and conspiracy.

In the instant matter, Defendant Vincent Doan has moved to dismiss this case on the grounds that Plaintiffs' Complaint fails to state a claim upon which relief can be granted. Defendant also challenges the constitutionality of the VAWA on its face and as applied. Furthermore, Defendant argues that Plaintiffs' claim under 42 U.S.C. § 1983 should be dismissed because their complaint fails to state a claim upon which relief can be granted and that the state law claims should be dismissed for lack of supplemental jurisdiction.

Plaintiffs filed a Response to Defendant's dismissal motion. Specifically, Plaintiffs assert that an examination of Defendant's abusive language and actions toward Carrie reflect his animus toward women in general. The Government has intervened pursuant to 28 U.S.C. § 2403(a) and argues in support of the constitutionality of the Act. The National Organization of Women Legal Defense and Education Fund ("NOW") also moved to intervene and file an amici curiae brief in support of the constitutionality of the Act.

## STANDARD OF REVIEW

### Failure To State A Claim

Before deciding constitutional issues, it is the duty of this Court to first consider every non-constitutional ground for its decision. *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

Generally, when construing a motion to dismiss pursuant to Rule 12(b)(6) of the

---

**2.** *See State v. Doan,* No. 97–5–077–CR (Clin-   ton Cty. Court of Common Pleas).

Federal Rules of Civil Procedure, the court must construe the complaint liberally in favor of the party opposing the motion. *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). Although the Court need not accept legal conclusions or unwarranted factual inferences, *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir. 1987), all other allegations made in the complaint are taken as true. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir.1990); *see also Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993) (indicating that the purpose of Fed.R.Civ.P. 12(b)(6) is simply to determine if the plaintiff is entitled to relief if all the allegations in the plaintiff's complaint are true). The complaint need not express in detail all particularities of plaintiff's claim. *Westlake,* 537 F.2d at 858. Rather, as Fed.R.Civ.P. 8(a)(2) requires, the complaint need only provide "a short and plain statement" of the claim showing that the plaintiff is entitled to relief. *Id.* The plaintiff has accomplished this goal when the complaint affords the defendant fair notice of what plaintiff's claim is and the grounds upon which it rests. *Id.*

Thus, Rule 12(b)(6) is a test of the formal sufficiency of the statement of the citation for relief; it is not a procedure to resolve a contest about the facts or merits of the case.

Granting a motion to dismiss is seen as an extraordinary remedy that should not be done "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Westlake,* 537 F.2d at 858 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *See also Collins v. Nagle,* 892 F.2d 489, 493 (6th Cir.1989).

**3.** The VAWA provides that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981. Although Congress provided both criminal and civil provisions in the VAWA to address acts of violence against women, for the purposes of the instant matter, all references to the Act are in regards to the civil provisions.

## DISCUSSION

### I. Plaintiffs' Claim Under the Violence Against Women Act

The civil provisions of the Violence Against Women Act of 1994 (hereinafter the "VAWA" or "the Act"), Pub.L. No. 103–322 § 40001–40703, 108 Stat. 1796, 1902–55, provide a claimant with a civil right to be free from crimes of violence motivated by gender and provides a federal civil rights cause of action for victims of crimes of violence motivated by gender. *See* 42 U.S.C. §§ 13981(a)–(c).[3] In order to establish a cause of action under the VAWA, the claimant must show (1) that she was a victim of a cause of violence and (2) that the crime was motivated based on her gender. 42 U.S.C. § 13981(c). The claimant does not need to show that there has been a prior criminal complaint, prosecution, or conviction against the defendant. 42 U.S.C. § 13981(e)(2).

The Act defines a "crime of violence" as "an act or series of acts that would constitute a felony ... whether or not those acts have actually resulted in criminal ·charges, prosecution, or conviction," 42 U.S.C. § 13981(d)(2)(A), or acts that would constitutes a felony·"but for the relationship between" the parties, i.e., marriages in states· where laws exist to provide spousal immunity.[4] 42 U.S.C. § 13981(d)(2)(B). Additionally, the Act defines the term "crime motivated by gender" as being done by the defendant "because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender...." 42 U.S.C. § 13981(d)(1). "Gender motivation" is to be determined through the use of circumstantial evidence in light of the totality of the circumstances similar to the

**4.** For instance, the VAWA provides spousal-victims of crimes of violence in states such as Louisiana and Georgia, whose laws prevent victims from bringing tort claims in state courts because of inter-spousal tort immunity statutes, the ability to bring claims in federal court and seek damages.

manner determinations are made in cases of race and gender discrimination claims. S.Rep. No. 102–197 at 50 (1991).[5] Finally, the types of civil damages that the claimant may seek under the Act are compensatory and punitive damages as well as attorneys' fees and injunctive relief. 42 U.S.C. § 13981(c).[6]

In the case at bar, Plaintiffs point to Defendant's allegedly violent attacks on Carrie, asserting that those attacks were motivated primarily based on Carrie's gender and support a cause of action under the VAWA. Defendant does not dispute that Plaintiffs' allegations of Carrie's murder satisfies the definition of a crime of violence under § 13981(d)(2). However, Defendant argues that Plaintiffs fail to show that his actions were in any way motivated by Carrie's gender to satisfy the second element of "gender-based violence" under the VAWA.

As we noted earlier, the appropriate determination as to whether a particular act of violence is gender-motivated is based on the totality of the circumstances. In viewing the totality of the circumstances, we note that the extent or animus of the perpetrator is a question of fact. *Heights Community Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir.1985). Having reviewed the totality of the allegations made in Plaintiffs' Complaint, we believe that the Complaint does sufficiently set forth a claim under the VAWA. Moreover, we conclude that the allegations by Plaintiffs, if proven, are consistent with a showing that Defendant's actions toward Carrie were gender-motivated. For instance, on one occasion, Defendant allegedly forced his way into Carrie's home and attempted to assault her. Although the assault was unsuccessful, Defendant allegedly threatened Carrie to stay away from other men. We believe these allegations of Defendant's attempted assault and simultaneous threat to Carrie in order to prevent her from dealing with other men are sufficient to allege gender animus under the VAWA. *Cf. McCann v. Bryon L. Rosquist, D.C., P.C.*, 998 F.Supp. 1246, 1252–53 (D.Utah 1998) (declaring that particular expressions of affection may be laden with disrespect for women regardless of the so-called amorous intentions of the perpetrator); *Crisonino v. New York City Hous. Auth.*, 985 F.Supp. 385, 391 (S.D.N.Y.1997) (denying in part defendant's motion for summary judgment and reasoning that "[i]f for instance Eisenstat called plaintiff a 'dumb bitch' and later shoved her to the ground, . . . a reasonable jury [could] conclude that his actions were committed because of plaintiff's gender and were due, at least in part, to the animus based on gender."). Accordingly, we DENY Defendant's Motion to Dismiss Plaintiffs' Complaint on this ground.

## II. The Constitutionality of the Violence Against Women Act

Next, Defendant argues that the VAWA is unconstitutional, in and of itself, because Congress exceeded its authority pursuant to both the Commerce Clause and Enforcement Clause of the Fourteenth Amendment of the United States Constitution. Specifically, Defendant contends that Congress only has authority to regu-

5. Viewing the totality of the circumstances, Congress intended Title VII cases, which address employment discrimination, to provide substantial guidance in determining whether the alleged violence was motivated based on the victim's gender. *See* S.Rep. No. 103–138 at 52–53 (1993). Additionally, Congress intended that the circumstances in identifying hate crimes may also be used in determining whether the alleged violence is motivated by gender. S.Rep. No. 102–197 at 50 n. 72 (1991).

6. Specifically, the Act provides:

A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

42 U.S.C. § 13981(c).

late activity that has a substantial impact on commerce or is in some relation connected to interstate commerce under the Constitution. Although conceding that women do often travel between states, Defendant asserts that there still must be a greater "nexus" between the regulated activity, i.e., gender-based crimes of violence, and interstate commerce. Defendant argues that, because the activity Congress sought to regulate under the VAWA does not have a substantial relation to interstate commerce or any sort of economic enterprise, Congress overstepped its authority under the Commerce Clause power and the Enforcement Power of § 5 of the Fourteenth Amendment in enacting the VAWA, and thus the VAWA is unconstitutional and Plaintiff's claim pursuant to the statute must be dismissed.

The seminal case recognizing Congress's authority under the Commerce Clause is *Gibbons v. Ogden*, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824). In resolving a dispute over state and federal licensing for steamboats, the Court in *Gibbons* indicated that Congress's authority under the Commerce Clause could be used to address all matters of commercial intercourse. *Id.* at 189–90, 9 Wheat. 1. Moreover, with the Court's indication that Congressional authority under the Commerce Clause is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than those that are prescribed in the Constitution," *Gibbons*, 22 U.S. at 196, 9 Wheat. 1, Congress's power under the Commerce Clause would greatly expand over the following years.

In 1937, the Supreme Court indicated that Congress had the authority under its commerce power to regulate commercial activity that might not particularly be characterized as interstate in nature, but directly effects interstate commerce. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937). This was seen as giving Congress the power to regulate intrastate commercial activities. In 1941, the Court established the rational basis standard to determine whether Congress acted within its power in passing legislation pursuant to its Commerce Clause authority. *United States v. Darby*, 312 U.S. 100, 120–21, 61 S.Ct. 451, 85 L.Ed. 609 (1941). First, under the rational basis standard, the court must defer to a congressional finding that a regulated activity affects interstate commerce if there is any rational basis for such a finding. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 303–304, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Second, the court must ensure that the means chosen by Congress are "reasonably adapted to the end permitted by the Constitution." *Hodel v. Virginia Surface Mining & Reclamation Assn.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (citing *Heart of Atlanta Motel*, 379 U.S. at 262, 85 S.Ct. 348). Thus, once the judiciary determines that Congress acted or did not act rationally in enacting be particular legislation, the court's task is at an end. *Id.*

Although the breadth of Congressional power under the Commerce Clause appears plenary, the Court recently uprooted legislation passed by Congress pursuant to its authority under the Commerce Clause in *United States v. Lopez*, 514 U.S. 549, 552, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez*, authorities acted on an anonymous tip and arrested a twelfth grade high school student after he arrived at his school carrying a concealed .38 caliber handgun and five bullets. *Id.* at 551, 115 S.Ct. 1624. The federal authorities charged the student with violating the Gun–Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows or has reasonable cause to believe is a school zone." *Id.* However, the *Lopez* Court affirmed the Fifth Circuit's finding that the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), was an unconstitutional usage of Congress's Commerce Clause authority and struck down the legislation. *Id.* at 552, 115 S.Ct. 1624.

In analyzing the constitutionality of the Gun–Free School Zones Act of 1990, the Court reiterated a warning made earlier in the *Jones* decision that Congressional authority under the Commerce Clause "must be considered in light of our dual system of government and may not be extended so as to embrace the effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez,* 514 U.S. at 557, 115 S.Ct. 1624; *see also Jones,* 301 U.S. at 37. The Court indicated that there are three categories of activity that Congress may regulate under the Commerce Clause power. *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624. First, Congress may regulate the use of the channels of interstate commerce. *Id.* at 558, 115 S.Ct. 1624 (citing *Hodel,* 452 U.S. at 276–77, 101 S.Ct. 2352; *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *Darby,* 312 U.S. at 114, 61 S.Ct. 451). Second, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. *Id.* (citing *Perez,* 402 U.S. at 150, 91 S.Ct. 1357; *Shreveport Rate Cases,* 234 U.S. 342, 359, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); *Southern R. Co. v. United States,* 222 U.S. 20, 27, 32 S.Ct. 2, 56 L.Ed. 72 (1911)). Finally, Congress may regulate those activities that substantially affect interstate commerce. *Id.* (citation omitted); *see also Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (applying the cumulative effects test to find that Congress could reach local activity if the activity "exerts a substantial economic effect on interstate commerce"). The Court then declared that the constitutionality of the Gun–Free School Zones Act of 1990 stood on whether it passed muster under the third category: "a regulation of activity that substantially affects interstate commerce." *Lopez,* 514 U.S. at 559, 115 S.Ct. 1624.

Delivering the majority opinion for the Court, Chief Justice Rehnquist concluded that "Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms". *Id.* at 561, 115 S.Ct. 1624. Although opining that Congress is not necessarily required to provide formal legislative and congressional committee findings regarding any particular activity's effect on interstate commerce, *Lopez,* 514 U.S. at 562–63, 115 S.Ct. 1624 (citing *McClung,* 379 U.S. at 304; *Perez,* 402 U.S. at 156, 91 S.Ct. 1357), Justice Rehnquist made clear that the Court will consider any legislative and congressional committee findings regarding the particular activity's effect on interstate commerce. *Id.* at 562, 115 S.Ct. 1624 (citing *Preseault v. I.C.C.,* 494 U.S. 1, 17, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990)). Moreover, Justice Rehnquist declared that the Court welcomes such findings to the extent that they enable the Court to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, rather than rely on Congress's mere accumulation of "institutional expertise." *Lopez,* 514 U.S. at 563, 115 S.Ct. 1624. This is especially true in cases, such as *Lopez,* in which the legislation in question represents a sharp break with the long-standing pattern of similar legislation. *See id.* ("Section 922(q) plows thoroughly through new ground and represents a sharp break with the long-standing pattern of federal firearms legislation.").

A fact that should not be overlooked is that the Government conceded in *Lopez* that "[n]either the [Gun–Free School Zones Act] nor its legislative history contain[ed any] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." *Id.* (citing the Brief for United States at 5–6). Apparently, the failure to make any congressional findings, among other things, proved fatal to the legislation's enactment, as the Court rejected the Govern-

ment's bare contentions that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy. Striking down the legislation as an unconstitutional encroachment of congressional authority under the commerce clause, the Court concluded that:

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.

*Id.* at 567, 115 S.Ct. 1624.

In 1994, Congress passed the VAWA pursuant to its authority upon both the Commerce Clause, Section 8 of Article I [7], and the Fourteenth Amendment, Section 5 [8], of the United States Constitution. The VAWA is Congress's attempt to address the widespread problems of violence against women in America.[9] In enacting the legislation, Congress held hearings over a four-year period and accumulated significant documentation about how violence against women based on their gender affects interstate commerce and interferes with a woman's ability to enjoy equal protection of the laws. During the hearings, Congress received testimony from a diverse group of people and organizations, including victims of violence, law enforcement officials from district attorneys' and state attorneys' general offices, the National Federation of Business and Professional Women, the Judicial Conference of the United States, NOW, the America Civil Liberties Union, the National Association of Women Judges, the Department of Justice, rape crisis centers, New York University Law School professor, Burt Neuborne, and University of Chicago Law School professor, Cass Sunstein, psychiatrists, physicians and other mental health experts. *See Ziegler v. Ziegler*, 28 F.Supp.2d 601, 609–10 (E.D.Wash.1998).[10]

At the conclusion of the hearings, Congress made the following findings:

1. Violence is the leading cause of injury to women ages 15–44, more common than automobile accidents, muggings, and cancer deaths combined.[11]

2. In 1991, at least 21,000 domestic crimes were reported to police every week; at least 1.1 million reported assaults—including aggravated assaults, rapes, and murders—were committed against women in their homes that year; unreported domestic crimes have been estimated to be more than three times this total.[12]

3. Every week, during 1991, more than 2,000 women were raped and more than

---

7. Section 8, Article I of the United States Constitution authorizes Congress "to regulate commerce ... among the several states." U.S. Const.Art. I, § 8, cl. 3.

8. The Enforcement Clause gives Congress authority to "enforce by appropriate legislation" the provisions of the Fourteenth Amendment. U.S. Const.Amend. XIV, § 5. Section 1 of the Fourteenth Amendment provides that "No State shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Section 5 of the Fourteenth Amendment states that "the Congress shall have power to enforce by appropriate legislation, the provisions of this article." U.S. Const.Amend. XIV, § 5.

9. Congress enacted the Violence Against Women Act as part of the larger Violent Crime Control and Law Enforcement Act of 1994, P.L. 103–322.

10. For further insight into the hearings regarding the Act *see* S.Hrg. 897, 101st Cong., 2d Sess., Domestic Violence: Terrorism in the Home, 2 (April 19, 1990); S.Hrg. 939, Pt. 1, 101st Cong., 2d Sess., Women and Violence, 7 (June 20, 1990); S.Hrg. 101–939, Pt. 2, 101st Cong., The Violence Against Women Act of 1990, 51 (Oct. 19, 1990); S.Hrg. 369, Hearing Before the Committee on the Judiciary, 102d Cong., 1st Sess. (April 9, 1991); Violence Against Women, Hearing Before the House Subcommittee on Crime and Criminal Justice, 102d Cong., 2d Sess. (Feb. 6, 1992).

11. *See* S.Rep. 103–138, at 38 (1993).

12. S.Rep. 138, at 37.

90 women were murdered—9 out of 10 times by men.[13]

4. An estimated 4 million American women are battered each year by their husbands or partners. Approximately 95% of all domestic violence victims are women. About 35% of women visiting hospital emergency rooms are there due to injuries sustained as a result of domestic violence. One study of battered women found that 63% of the victims had been beaten while they were pregnant.[14]

Since the Supreme Court's decision in Lopez, there have been a number of challenges to the constitutionality of the VAWA. Similarly to the decision in Lopez, courts typically analyze the constitutionality of the VAWA pursuant to Congress's Commerce Clause authority and examine whether the Act is regulating an activity that substantially affects interstate commerce. Courts also analyze the constitutionality of the Act pursuant to Congress's Enforcement Clause power under § 5 of the Fourteenth Amendment.

Of those cases, most courts have concluded that the Act is a constitutionally-sound enactment by Congress. See Doe v. Mercer, 37 F.Supp.2d 64, 68–69 (D.Mass. 1999); Liu v. Striuli, 36 F.Supp.2d 452, 477–78 (D.R.I.1999) (rejecting a challenge to the constitutionality of the Act); Ziegler, 28 F.Supp.2d at 613–14 (finding the statute constitutional based on Congress's authority under the Commerce Clause and not reaching the question of whether the Act is constitutional under § 5 of the Fourteenth Amendment); C.R.K. v. Martin, Civ. No. 96–1431, 1998 WL 1100062 (D.Kan. July 10, 1998) (concluding that the findings by Congress sufficiently support

the enactment of the legislation pursuant to the Commerce Clause power); Timm v. Delong, 59 F.Supp.2d 944 (D.Neb.1998) (determining that the VAWA is constitutional under both the Commerce Clause and the Fourteenth Amendment); Mattison v. Click Corp. of America, Inc., Civ.A. No. 97–CV–2736, 1998 WL 32597, at *9 (E.D.Pa. Jan.27, 1998) (denying the defendant's motion to dismiss after concluding that the plaintiff's claim was actionable under the VAWA); Crisonino, 985 F.Supp. at 396–97 (holding that the civil remedies provision of the VAWA is a valid exercise of Congress's Commerce Clause power); Anisimov v. Lake, 982 F.Supp. 531, 540 (N.D.Ill.1997) (denying the defendant's motion to dismiss after concluding that the VAWA's civil rights remedy is "a permissible exercise of congressional authority under the Commerce Clause, and reasonably adapted to its goal of providing redress to victims of gender-motivated violence"); Seaton v. Seaton, 971 F.Supp. 1188, 1190 n. 1 & 1195 (E.D.Tenn.1997) (finding the VAWA constitutional under the Commerce Clause and rendering moot any discussion on the Act's constitutionality under the Fourteenth Amendment); Doe v. Hartz, 970 F.Supp. 1375, 1423 (N.D.Iowa 1997) (denying the defendant's motion to dismiss on the grounds that the VAWA exceeds Congress's authority under the Commerce Clause)[15]; Doe v. Doe, 929 F.Supp. 608, 617 (D.Conn.1996) (finding the Act valid under the Commerce Clause). Only one court has found the civil remedies provision of the VAWA unconstitutional under either Congress's Commerce Clause of Article I, Section 8, or the Enforcement Clause of Section 5 of the Fourteenth Amendment. See Brzonkala v. Virginia Polytechnic & State Univ., 169 F.3d 820, 826–27 (4th Cir.1999).

13. Id.

14. H.R.Rep. 95, 103d Cong., 1st Sess., Violence Against Women Act of 1993, No. 103–395, at 26 (1993).

15. We note that the Eighth Circuit Court of Appeals reversed and remanded the case to the district court's with direction to dismiss

the case, concluding that the lower court should not have reached the constitutional question concerning the VAWA because the plaintiff failed to sufficiently allege in her complaint that the sexual advances of her priest constituted a "crime of violence" as required under the Act. Doe v. Hartz, 134 F.3d 1339, 1342 (8th Cir.1998).

Defendant cites *Brzonkala* in support of his proposition that this Court should also find the Act an unconstitutional eclipse of Congress's power under either the Commerce Clause or the Fourteenth Amendment. Defendant asserts that the VAWA is not a regulation in which Congress has sought to protect an instrument of interstate commerce or a thing in interstate commerce. While Defendant concedes that women do often travel in between states, more is required to qualify for the commerce power. Further, Defendant argues that under the VAWA, and in accordance with the dictates of *Lopez*, there must be a "nexus" between interstate commerce and the regulated activity, gender-based crimes of violence. In other words, Defendant asserts that there must either be a showing of a statutory jurisdictional nexus linking the activity to commerce or of congressional findings linking the activity to interstate commerce. Defendant asserts that neither exists in this case.

■■■ Under the doctrine of judicial restraint, the task that the court takes on in determining the constitutionality of the VAWA requires the Court to pass through a corridor that is "relatively narrow." *Hodel*, 452 U.S. at 276, 101 S.Ct. 2352.[16] Courts generally review acts of Congress with deference, as they are entitled to a strong presumption of validity and constitutionality. *Mistretta v. United States*, 488 U.S. 361, 384, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (indicating that acts of Congress are invalidated only "for the most compelling constitutional reasons"); *see also Bowsher v. Synar*, 478 U.S. 714, 736, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Ziegler*, 28 F.Supp.2d at 607–08 (citing *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)). As previously stated, we must defer to Congressional findings that an activity affects

interstate commerce if there is any rational basis for such a finding. *Hodel*, 452 U.S. at 276, 101 S.Ct. 2352 (citing *Heart of Atlanta Motel*, 379 U.S. at 258, 85 S.Ct. 348; *Katzenbach*, 379 U.S. at 303–04, 85 S.Ct. 377). Further, if it is determined whether Congress had a rational basis for its findings, we must still determine whether the particular scheme chosen by Congress is reasonably adapted to its intended end. *Hodel*, 452 U.S. at 276, 101 S.Ct. 2352.

■■ After four years of hearings concerning the affects of violence against women, the congressional committee made extensive and detailed findings regarding the problem of violence against women and its affect on interstate commerce.

Congress determined that domestic violence alone costs employers an estimated $3 billion a year due to absenteeism in the workplace. S.Rep. No. 101–545, at 33 (1990). Congress also found that the effect of violence against women takes a significant toll on the healthcare and criminal justice system as society puts $5 to $10 billion a year in these and other systems to counter the affects. S.Rep. No. 103–138, at 41 (1993). In essence, violence against women takes a toll on society economically and non-economically, harming the careers and educational opportunities of women, causing them health problems, and costing them their families and sometimes their lives.

Congress concluded that:

[C]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce ... by diminishing national productivity, increasing medical

---

16. In concurring with the majority opinion in *Lopez*, Justice Kennedy stated that:
The history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still

emergent in our own era counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power.
*Lopez*, 514 U.S. at 568, 115 S.Ct. 1624 (Kennedy, J., concurring).

and other costs, and decreasing the supply of and the demand for interstate products.

H.R.Conf.Rep. No. 113–711, at 385 (1994), reprinted in 1994 U.S.S.C.A.N. 1839, 1653. Nonetheless, as Defendant maintains, just because Congress asserts that an activity affects interstate commerce does not make it a proven fact. *Katzenbach*, 379 U.S. at 303, 85 S.Ct. 377 (declaring that "the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court"); *Seaton*, 971 F.Supp. at 1193 (citing *Hodel*, 452 U.S. at 311, 101 S.Ct. 2352). Our goal is to determine whether the legislators, "in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce...." *Katzenbach*, 379 U.S. at 303–04, 85 S.Ct. 377. It is only then that our investigation is at an end. *Id.* at 304, 85 S.Ct. 377.

Defendant contends that the congressional findings do not have a rational basis in regards to interstate commerce. Specifically, Defendant asserts that despite the congressional findings Congress supplied in enacting the VAWA, the analysis of the VAWA in light of *Lopez* show that the VAWA is unconstitutional. For instance, Defendant asserts that (1) both the Gun–Free School Zones Act and the VAWA are criminal in nature; (2) both are noncommercial in nature; (3) both lack a requisite jurisdictional element; (4) both only have a remote, if any, effect on interstate commerce; and (5) both are encroachments of Congress's commerce clause power. We disagree with each of Defendant's contentions in this case. Moreover, we find the VAWA to be significantly distinguishable from the Gun–Free School Zones Act, such that the application

of a *Lopez* analysis strengthens the case for its constitutionality.

First, reviewing the legislative history surrounding the VAWA, we agree with Judge Nielsen's view in *Ziegler* that:

> Without doubt, the evidence before Congress revealed a significant incidence of violence against women, some of which is very likely based on gender (e.g., rape) and some of which may be based on gender (e.g., domestic violence). There was substantial evidence that the violence dramatically affects women's lives (e.g., their productivity at work) and also affects the national market by affecting the women's ability to participate in the national economy.

*Ziegler*, 28 F.Supp.2d at 611. Defendant would have this Court ignore four years of congressional debate and committee investigations culminating into findings that discriminatory violence against women affects interstate commerce.

In *United States v. Wall*, 92 F.3d 1444, 1451–52 (6th Cir.1996), the Sixth Circuit reaffirmed that courts should give due deference to congressional findings under the rational basis test and indicated that *Lopez* does not change this application. The appellate court opined that while:

> *Lopez* casts a shadow on regulation that is tenuously related to interstate commerce, ... [u]ntil the Supreme Court provides a clearer signal or cogent framework to handle this type of legislation, this court is content to heed the concurrence of two Justices that the history of Commerce Clause jurisprudence still 'counsels great restraint.'

*Wall*, 92 F.3d at 1451–52 (quoting *Lopez*, 514 U.S. at 568, 115 S.Ct. 1624 (Kennedy, J. concurring)); *see also Seaton*, 971 F.Supp. at 1193 (citing *Wall* and acknowledging the lack of guidance *Lopez* bestowed on commerce clause cases).[17]

---

**17.** The Third Circuit Court of Appeals echoed this same concern in *United States v. Bishop*, 66 F.3d 569, 590 (3rd Cir.1995), rejecting the appellants contention that *Lopez* represented such a sharp break with the Court's precedents in commerce clause cases such that the lower court's should supplant congressional

judgments with their own. Instead, the court declared that the lower courts should keep in mind that Justices Kennedy and O'Connor, who fully concurred in the majority opinion, did not view the majority's opinion in that way. "Rather, Justices Kennedy and O'Con-

Thus, contrary to Defendant's contention that *Brzonkala* proclaimed that *Lopez* altered the manner courts should examine legislation enacted pursuant to the commerce power, we find where the court in *Brzonkala* failed to examine *Lopez* in light of the standards courts apply in reviewing legislative findings in cases that Congress has exercised its authority under the Commerce Clause.

Recognizing that the congressional findings were compiled after years of gathering substantial evidence about the affect violence targeted toward women on account of their gender has on both the lives of women and the national economy by limiting their participation in the national marketplace, we will not now eschew our role in deferring to those findings if they are rationally related to commerce.

Secondly, the *Lopez* Court criticized the Gun–Free School Zones Act as being strictly criminal in nature and having nothing to do with a commercial purpose or economic enterprise. *Lopez,* 514 U.S. at 559, 115 S.Ct. 1624. Finding no economic foundation, let alone a foundation that touched upon interstate commercial activities, the Court concluded that the Gun–Free School Zones Act could not be "sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate substantially affects interstate commerce." *Id.* In this case, the VAWA has both criminal and civil provisions, both of which are justified on the grounds that violence against women burdens interstate commerce.[18]

Similar to the burdens on interstate commerce due to racial discrimination that necessitated congressional intervention in *Heart of Atlanta Motel* and *Katzenbach,* Congress determined that the aggregate affect of violence against women substantially burdens interstate commerce, namely by decreasing business activities, hindering women's willingness to travel, and preventing women from full participation in the overall marketplace of the nation.

Third, although Defendant asserts that, according to *Lopez,* the VAWA is unconstitutional specifically because it lacks a jurisdictional element, the Sixth Circuit has rejected this conclusion. *See Wall,* 92 F.3d at 1449 n. 11 (stating that it does not find persuasive an interpretation of *Lopez* that a jurisdictional element in the Gun–Free School Zones Act was mandatory). The *Lopez* Court did not mandate a jurisdictional element in the Gun–Free School Zones Act; rather, the Court stated that a jurisdictional element would only have ensured, through a case-by-case inquiry, that the individual firearm at issue affected interstate commerce. Thus, the Court recognized that a jurisdictional element is merely one way in which Congress can link a statute to interstate commerce, not the only way. *See Wall,* 92 F.3d at 1449 n. 11; *accord United States v. Olin Corp.,* 107 F.3d 1506, 1510 (11th Cir.1997) (rejecting the district court's conclusion that *Lopez* requires every statute enacted pursuant to Congress's Commerce Clause authority contain a jurisdictional element); *United States v. Rybar,* 103 F.3d 273, 285 (3rd Cir.1996) (declaring that the *Lopez* Court

---

nor counseled 'great restraint' before a court finds Congress to have overstepped its commerce power, and believed the Court's opinion to have been a 'necessary though limited holding.' " *Id.* We must agree that, like the courts in *Bishop* and *Wall,* unless otherwise given a clearer signal or cogent framework to address this type of legislation, "the winds have not shifted that much." *Id.; see also United States v. Hartsell,* 127 F.3d 343, 348 n. 1 (4th Cir.1997) (stating "we do not agree that *Lopez* is a radical sea change which invalidates the decades of Commerce Clause analysis.").

18. *United States v. Page,* 167 F.3d 325, 334 (6th Cir.1999), the Sixth Circuit concluded that the criminal provisions of the VAWA are constitutional because "the interstate domestic violence provision's requirement of 'crossing of a state line ... places' the [commission of a crime of violence causing bodily injury] squarely in interstate commerce." *Id.* (citation omitted). Although *Lopez* caused some controversy in analyzing cases dealing with intrastate commercial activities, the *Page* court acknowledged that Congress still retained plenary power to regulate the channels of interstate commerce. *Id.* at 334–35.

did not require a jurisdictional element to be an essential statutory feature in the Gun–Free School Zones Act); *United States v. Wilson*, 73 F.3d 675, 685 (7th Cir.1995) (rejecting the reading of *Lopez* in a manner that a jurisdictional element was required); *Doe v. Mercer*, 37 F.Supp.2d at 69–70 (D.Mass.1999) ("A jurisdictional element is one way in which Congress can link a statute to interstate commerce...."); *Timm*, 59 F.Supp.2d at 957 (D.Neb.1998) ("The jurisdictional nexus is best interpreted as an alternative avenue to constitutionality rather than as a requirement."). It is this Court's conclusion that an analysis of *Lopez* only strengthens the Court's view that there is a rational basis for Congress's findings that gender-motivated violence substantially impacts interstate commerce.

Still, we must determine whether the means Congress chose to address the problem of gender-motivated violence is reasonably adapted to its intended end. We believe that the means are reasonably adapted to the intended end. In short, reviewing the Act and the activities Congress viewed under the statute as inflicting great harm on the society, we conclude that the VAWA is consistent with other civil rights legislation enacted by Congress and upheld by the courts as constitutional under the Commerce Clause. *See EEOC v. Wyoming*, 460 U.S. 226, 243, 103 S.Ct. 1054, 75 L.Ed.2d 18 (Age Discrimination in Employment Act); *Katzenbach*, 379 U.S. at 305, 85 S.Ct. 377 (Title II of the Civil Rights Act of 1964), *Heart of Atlanta Motel*, 379 U.S. at 261, 85 S.Ct. 348 (same).

Examining the VAWA and the legislative history surrounding its enactment, we conclude that Congress did not exceed its authority under the Commerce Clause when enacting the legislation. Moreover, we agree with the majority of jurisdictions that have found the VAWA constitutional based on Congress's Commerce Clause authority. Accordingly, we DENY Defendant's Motion to Dismiss on the ground that the VAWA is an unconstitutional encroachment of Congress's Commerce Clause power.

Having concluded that the VAWA is constitutional based on Congressional authority under the Commerce Clause, we need not discuss the constitutionality of the Act under the Enforcement Clause of the Fourteenth Amendment.

## III. Plaintiffs' Claim Under 42 U.S.C. § 1983

Next, Defendant Doan argues that Plaintiffs' Complaint should be dismissed because Plaintiffs fail to sufficiently allege a claim that Defendants violated 42 U.S.C. § 1983.[19] Specifically, Defendant assert that Plaintiffs fail to show how Defendants' actions were under the color of law or deprived them of some right or privileged secured by the Constitution or laws of the United States. Defendant also asserts that the theory of *respondeat superior* is inapplicable under § 1983 and that Plaintiffs cannot base their claim of state action against Defendants under a conspiracy theory solely on basis of Defendant Payton's conduct, but must show that Defendant Village of Blanchester is itself liable for condoning a policy or custom within the police department that lead to the deprivation of Plaintiffs' constitutionally protected rights. Defendant asserts that, at best, the only claim Plaintiffs can make is that

---

**19.** 42 Section 1983 provides:.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Defendant Village of Blanchester failed to act to prevent Defendants' actions, not that Defendant Village of Blanchester condoned any policy or custom that caused the alleged cover-up of Carrie's murder. Absent any allegations that Defendants intended to cause Plaintiffs injury or that Defendants engaged in some type of conspiracy, Defendant contends that Plaintiffs' claim under § 1983 must be dismissed.

In response, Plaintiffs assert that they have sufficiently alleged a § 1983 claim against Defendants in their Complaint. Plaintiffs argue that it is not necessary for an individual to be an officer of the state in order to act "under the color of law" if it is shown that the person was a willful participant in a concerted action with the state or its agents. Plaintiffs maintain that Defendant Doan engaged in a conspiracy with Defendants Lawrence Baker, Tracey Baker and Chief Payton to ensure that Carrie's body would not be found and that any type of investigation into her disappearance would be thwarted. Plaintiffs contend that, because the question of whether a person acted "under the color of law" is a question of fact for the jury, the Court should allow the conspiracy allegations to be addressed during discovery and/or at trial. Plaintiffs argue that Defendant's assertion that there is no conspiracy falls more in line with a motion for summary judgment, not a motion to dismiss. Thus, Plaintiffs contend that Defendant's attack on the conspiracy claim is premature and his motion to dismiss should be denied.

In order to establish a claim under § 1983, a plaintiff must show that: (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) she was subjected to or caused to be subjected to this deprivation by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Monell v. Department of Soc. Servs. of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994) (citing

*Flagg Bros. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)). Although a municipality may be held liable under § 1983 if the municipality itself caused the constitutional deprivation, a municipality does not incur § 1983 liability for an injury inflicted solely by its agents or employees. *Monell,* 436 U.S. at 691–95, 98 S.Ct. 2018. In other words, a municipality is only liable under § 1983 when the injury is caused by the execution of its policy or custom. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (quotation omitted). "A 'custom' for the purposes of *Monell* liability must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe v. Claiborne Cty., Tenn.,* 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). Moreover, the supervisor through which § 1983 *respondeat superior* liability is being applied must have "encouraged the specific incident or misconduct or in some way directly participated in it." *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984).

While § 1983 does not itself grant any substantive rights, *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), it does provide a remedy for the deprivation of constitutional and federal rights. In this case, we first find that Plaintiffs, being Carrie's next of kin, have a protected property interest in the remains of Carrie's body under the Due Process Clause of the Fourteenth Amendment. *Brotherton v. Cleveland,* 923 F.2d 477, 481 (6th Cir.1991) (recognizing that "[t]he human body is a valuable resource" and that the "importance in establishing rights in a dead body has been, and will continue to be, magnified by scientific advancement."); *see also Whaley v. County of Tuscola,* 58 F.3d 1111, 1114 (6th Cir. 1995) (acknowledging the *Brotherton* court's holding, that "the aggregate of rights granted by the State of Ohio to [the next of kin] rises to the level of a 'legiti-

mate claim of entitlement' in the [deceased person's] body, ... protected by the due process clause of the Fourteenth Amendment," is the law of the Circuit). Secondly, we conclude that Plaintiffs sufficiently allege in their Complaint that Defendants intentionally engaged in the activity of "selective enforcement" in violation of § 1983 by failing to act upon her reports of abuse and beatings by Defendant Doan. Such actions of "selective enforcement" based on race, nationality, religion, or gender can give rise to a claim under § 1983. *Futernick v. Sumpter Township,* 78 F.3d 1051, 1057 (6th Cir.1996). Plaintiffs also sufficiently allege in their Complaint that Defendant Payton, the Chief of the Blanchester Police Department, acted under a policy or custom of the Blanchester Police Department to engage in "selective enforcement" in this case. While Defendant asserts that Plaintiffs cannot show that a conspiracy existed between the named Defendants, this Court believes that the matter should be addressed after discovery and through motions for summary judgment on this issue. In order to state a claim based on the existence of a conspiracy under § 1983, a plaintiff need only plead with some degree of specificity that the conspiracy occurred. *Gutierrez v. Lynch,* 826 F.2d 1534, 1538 (6th Cir.1987). "Vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim under 1983." *Id.* In Plaintiffs' Complaint, they allege that Defendant Payton warned Defendant Lawrence Baker that Defendant Doan would be a suspect in Carrie's disappearance. Plaintiffs also allege that Defendant Payton called off the search and investigation when the cadaver dogs discovered Carrie's scent at the edge of the pond; an inference that Defendant Payton enabled Defendants Lawrence Baker, Tracey Baker and Vincent Doan to remove her body from the pond that night. Thus, finding Plaintiffs Complaint does sufficiently allege a violation of § 1983 by Defendants,

we hereby DENY Defendant's motion to dismiss Plaintiffs' claim for a failure to state a claim under § 1983.

## IV. State Law Claims

Finding that Plaintiffs' claims under the VAWA and § 1983 should not be dismissed, this Court believes that it is appropriate to continue to exercise supplemental jurisdiction over Plaintiffs' state law claims.

Nevertheless, Defendant Doan also maintains that Plaintiffs' state law claims of intentional infliction of emotional distress and conspiracy should be dismissed for failure to state a claim.

First, we acknowledge that courts in the State of Ohio have permitted family members to bring claims to recover emotional distress damages without a showing of physical injuries. *Carney v. Knollwood Cemetery Assn.,* 33 Ohio App.3d 31, 35, 514 N.E.2d 430, 434 (1986) (adopting the theory of liability set forth at 4 Restatement of Law 2d, Torts (1979) 274, Section 868, which provides that: "[o]ne who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon a body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body.").[20] Further, Plaintiffs' allegations sufficiently allege emotional distress in this case due to Carrie's disappearance and subsequently-ruled death.

Secondly, we reiterate that Plaintiffs have sufficiently alleged that a conspiracy occurred between the named Defendants. Accordingly, we deny Defendant's motion to dismiss Plaintiffs' state law claims.

## CONCLUSION

Recognizing that a grant of a motion to dismiss is appropriate only if "it appears beyond doubt that the plaintiff's can prove

---

20. We recognize that the legal theory adopted by the Cuyahoga County Court of Appeals in the Sixth Appellate District in *Carney* has not been expressly adopted by the Supreme Court of Ohio.

no set of facts in support of his [or her] claims which would entitle him [or her] to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99, we hereby DENY Defendant Doan's motion to dismiss Plaintiffs' Complaint.

SO ORDERED.